Filed 1/19/16  P. v. Sylvester CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067157 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD253406) |
| MICHAEL HONG SYLVESTER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Melinda Lasater, Judge.  Affirmed in part; reversed in part with directions.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

Michael Hong Sylvester was charged with eight counts in a third amended consolidated information and a jury convicted him of the following:  two counts of

inflicting injury to a member of a dating relationship (counts 3 & 7) (Pen. Code, § 273.5, subd. (a));[1] two counts of assault by means of force likely to produce great bodily injury (counts 4 & 8) (§ 245, subd. (a)(4)); and one count of making a criminal threat (count 6) (§ 422). As to counts 7 and 8, the jury found Sylvester committed the offenses while he was released from custody on bail pending final judgment on an earlier felony offense (§ 12022.1, subd. (b)), and he personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)). The jury was unable to reach a verdict on the remaining three counts (counts 1, 2 & 5). The court declared a mistrial on those counts and granted the prosecution's motion to dismiss them and to strike deadly weapon allegations under count 6. The court found Sylvester had a prior serious felony conviction (§ 667, subd. (a)(1) and a prior strike conviction (§ 667, subds. (b)-(i)). After denying Sylvester's motion for a new trial and motion to dismiss his prior strike conviction allegation, the court sentenced Sylvester to 19 years in prison. The court also issued a criminal protective order prohibiting Sylvester from having contact with victims Natalia Adame and Jennifer Johnson, and his and Adame's daughter Alina S.

Sylvester contends (1) he is entitled to be resentenced because the trial court did not act with informed discretion when it sentenced him; (2) the court erred in allowing the prosecution to file the third amended information alleging a prior conviction after the jury had begun deliberations; (3) the court erred by not staying the sentence on his conviction of making a criminal threat under section 654; and (4) the criminal protective

---

[1]     All statutory references are to the Penal Code unless otherwise specified.

2

order barring him from contacting his and Adame's child Alina S. must be stricken because there is no statutory authority for the order and it violates his federal constitutional right to due process. We reverse the order allowing the prosecution to file the third amended information and remand with directions to reconsider that matter and to remove Alina S. from the protective order. We otherwise affirm the judgment.

FACTS

*Convictions Involving Victim Adame* (*Counts 3, 4 & 6*)

In January 2014, Sylvester was living in an apartment with his girlfriend, Natalia Adame, then nine months pregnant with their daughter, Alina. In the early morning hours of January 8, 2014, the woman who lived in the apartment below Sylvester and Adame was awakened by yelling, screaming and what sounded like "throwing things" above her. She heard a male voice that "sounded like rage" and a high-pitched, frightened female voice "begging him[,]" " 'I didn't do it. Please stop. I didn't do it.' "

Adame left the apartment and drove to her parents' house. Adame's father testified Adame "had been beaten about the face and her eyes." Her eyes were almost shut, blood was coming out of her mouth, and her shirt was stained with blood. She told her parents Sylvester had grabbed a knife and told her he was going to kill her.

Adame testified she called 911 from her parents' house because her parents told her to and her "face was kind of banged up and [she] was nine months pregnant." Adame told the 911 operator she had just left her house because her boyfriend "beat [her] up." She said Sylvester had slapped her "like eight times[,]" and the whole side of her face

3

was swollen.  She also told the operator Sylvester pulled a knife on her and said he was going to kill her.

A police officer arrived at Adame's parent's house in response to Adame's 911 call at 7:30 a.m.  Adame was crying and her face was swollen, bruised, and bloody.  She was wiping blood from her mouth and there was blood on her shirt.  The officer immediately radioed for paramedics.

Adame told the officer she had tried to wake Sylvester but he would not wake up.  When he finally did wake up, he was angry because he was going to be late for work.  Sylvester started yelling at her and slapping her across the face.  He slapped her about eight times and then punched her right ear, which caused her to fall.  Sylvester repeatedly told Adame he was going to kill her.  He picked up a plastic bag and put it in her mouth to suffocate her while saying he was going to kill her.  As he was forcing the bag into her mouth, Adame fought back and bit his hand.  The bite caused him to withdraw his hand and enabled Adame to get the bag out of her mouth.  Sylvester picked up a t-shirt and tried to strangle her with it, but she fought him off.  He then produced a hunting knife and lunged at her several times with the knife.  She was able to get away from him and drive to her parents' house.

Adame told the officer and testified at trial that during the altercation, Sylvester told her he was going to kill her baby by kicking her in the stomach.   Sylvester also told her he was going to send someone over to her brother's house to kill him.

A firefighter paramedic who arrived at her parents' house to treat her injuries on the morning of the incident testified Adame was distraught and sobbing when he arrived,

4

and "[o]bviously looked like she had been abused or assaulted." Adame told the paramedic her boyfriend struck her multiple times on the face with his hands because she did not wake him up, and he threw her to the ground.

A short while later, an ambulance paramedic arrived at Adame's parents' house and assessed Adame's condition. The paramedic observed Adame's face was extensively bruised and "very, very swollen," especially her right ear, cheek, and lips. Adame told the paramedic Sylvester became upset with her because she did not wake him. She said he punched her several times in the face with his fists and threatened to harm her baby by kicking her in the stomach. He also pulled out a knife and attempted to stab her, but was unsuccessful. The paramedic transported Adame to a hospital.

A detective with expertise in strangulation interviewed Adame two days after the incident. The detective testified a common sign of strangulation is a petechial hemorrhage, which is a bursting of capillaries visible in the white of the eye or eyelid. The detective observed a petechial hemorrhage in the white of Adame's left eye.

Adame told the detective the altercation started when she did not wake Sylvester for work on time and he became angry. Sylvester took a white t-shirt and wrapped it around her neck. Adame was able to get the t-shirt off of her fairly quickly, but Sylvester then began to strangle her with his hands. Adame told the detective that on a scale of zero to 10 with 10 being severe, the pressure applied to her neck and the pain she experienced were both at a level 10. At some point during the struggle, Sylvester put a plastic bag over Adame's nose and mouth for between five and 10 seconds. He said to

5

Adame, "I'm going to kill you." She was unable to breathe and thought she was going to die. Sylvester had strangled her with his hands on two previous occasions.

*Convictions Involving Victim Johnson* (*Counts 7 & 8*)

Sylvester and Jennifer Johnson began an intimate relationship in October 2013 and lived together in Johnson's cousin's house in Escondido until they got into an argument that escalated into a physical fight in early December. After the fight Johnson told Sylvester to leave and he moved out.

When Sylvester was arrested for the offenses involving Adame on January 8, 2014, his mother and Johnson bailed him out of jail. Johnson then resumed her dating relationship with Sylvester and stayed with him in the apartment he had shared with Adame. Sylvester continued to contact Adame, but he told Johnson he was merely pretending to be in a relationship with Adame so she would drop the charges against him.

On February 5, 2014, Sylvester and Johnson got into a lengthy argument about Sylvester's relationship with Adame. Johnson accused Sylvester of lying about not actually being in a relationship with Adame and asked him for the truth. She became upset and started yelling at Sylvester when he refused to let her see a text message he had received from Adame. At one point during the argument, Johnson grabbed Sylvester's phone and threw it out of a sliding door toward some bushes. Johnson testified that Sylvester became enraged and started punching her in the face "very, very fast and very hard" in a "whirlwind of punches." She fell to the ground and Sylvester pulled her up, put his arm around her neck in a choke hold, and started choking her. Johnson "started seeing black" and was unable to breathe. She thought she was going to die. Sylvester

6

loosened his hold and Johnson tried to run, but Sylvester grabbed her and started choking her again. When Sylvester loosened his hold a second time, Johnson grabbed her purse and phone and ran out of the apartment. She hid behind a bush in front of the apartment and called 911.

Johnson told the 911 operator Sylvester had punched her in the jaw and it felt like it was broken. The pain on the left side of her face was excruciating. When the police arrived, they asked Johnson if she wanted medical attention, but she asked them to take her home because she did not have medical insurance and did not want emergency room bills.

The next morning her face was extremely swollen and she could not open her mouth. She went to an emergency room and was admitted to the hospital because her left jawbone was broken in two places. She was in the hospital for seven days where she underwent two surgical procedures that involved setting and bracing the fractures and placing two permanent titanium plates in her jaw to stabilize the bone segments. Six weeks later she underwent a third procedure to remove temporary braces the surgeon had placed on her teeth. During that six-week period, Johnson's mouth was wired shut and she could not eat solid food. She took prescription pain medication and was unable to work. Johnson's surgery left a scar on the left side of her face and she testified she cannot feel the left side of her face, chin, and bottom lip.

7

I

*Amendment of Information to Allege a Prior Conviction*

Sylvester contends the court erred in allowing the prosecution to file the third amended information alleging a prior conviction after the jury had begun deliberations.

<u>Relevant Proceedings</u>

On May 14, 1014, the prosecution filed a consolidated complaint that did not allege Sylvester had a prior strike conviction or serious felony conviction.[2]  At the conclusion of the preliminary hearing held that same day, the prosecutor told the court, "I have obtained some information regarding the defendant's prior criminal history from Florida that I was previously unaware of and was not considered earlier.  The defendant has been involved in such crimes as robbery, battery, and the list goes on."  The prosecutor explained that he "did not have a copy of [Sylvester's] rap sheet from Florida until recently."  The court reviewed a pretrial services report and noted that "information about any incidents in Florida was not included in the . . . [r]eport."

On July 3, 2014, the prosecution filed a second amended consolidated information, which did not allege any prior convictions.  On July 7, 2014, the parties appeared before Judge Lewis regarding a change of plea.  Sylvester had signed a change of plea form to plead guilty to two strikes with a stipulated prison term of eight years.  The prosecutor told the court, "There is an issue potentially with a prior conviction the People are still

---

[2]    The parties stipulated that the consolidated complaint be deemed the information.

8

not fully aware of. I believe the defendant was a juvenile in Florida. That's an issue [defense counsel] and I will need to discuss. Other than that, he is willing to plead guilty to what the offer was without the consideration of that prior."

After a break in the change of plea hearing, defense counsel informed the court that Sylvester had changed his mind about pleading guilty. Counsel stated, "Mr. Sylvester has indicated he is not interested in taking deals. What he is interested in doing is hiring private counsel." The court held a *Marsden*[3] hearing and denied Sylvester's request to change counsel.

The prosecutor then stated, "I would . . . like to make a record that the People had made the defendant an offer of pleading to two strikes with [a] stipulated term of eight years. [¶] That offer is now withdrawn. There is no offer. And I have made it clear to defense counsel that there is the possibility of an additional . . . prior that we are still looking into. We will continue to look into that. Whether or not that is something we can allege is yet to be determined." The court asked Sylvester, "Do you understand that?" Sylvester replied, "No, not really–a prior?" Sylvester's counsel then conferred with Sylvester off of the record.

On July 8, 2014, the day of trial, the prosecutor filed a trial brief in which he stated, under the heading "Possible Forthcoming Amended Charging Document," that the prosecution had put Sylvester and his counsel "on notice that the People will move to amend the current charging document if and when the People receive documentary

---

3    *People v. Marsden* (1970) 2 Cal.3d 118.

9

confirmation of [Sylvester's] adult conviction in the state of Florida." The trial brief stated that the conviction likely qualifies as a prior serious felony conviction and a prior strike conviction under the relevant California statutes. The brief further stated: "The People are awaiting the arrival of court-certified documentation from the Court in [Florida], but have yet to receive the documents. Upon arrival of the documents, the People will review whether or not [Sylvester's] conviction can be alleged under the above-named sections in the present case."

The parties appeared before Judge Lasater and Sylvester was arraigned on the second amended consolidated information, which did not allege any prior convictions. Regarding the prior conviction, the prosecutor informed the court he had been discussing with the defense the possibility that he would seek leave to amend the information to allege the prior Florida conviction, and that he was working on getting the necessary documents from Florida. The prosecutor explained there had been a tentative plea agreement with Sylvester the preceding week and the parties had appeared before Judge Lewis the previous day to enter the plea in open court, but Sylvester declined to enter into the agreement. Consequently, the prosecutor informed Judge Lewis that he would continue to pursue the paperwork regarding the Florida conviction and would seek leave to amend the information to allege a prior serious felony conviction and prior strike conviction if and when he obtained it.

Trial commenced before Judge Lasater on July 8, 2014. On July 14, the prosecution filed the third amended consolidated information, which added the prior serious felony and prior strike conviction allegations arising from Sylvester's March 2009

10

conviction in Florida. After the jury began deliberations, counsel and the court addressed Sylvester's objection to the third amended information. Sylvester's counsel argued that the defense was not on notice of the prosecution's intent to allege the prior conviction until July 3, 2014, the original trial date, and counsel did not receive the paperwork revealing what the prior conviction was until July 8. Consequently, Sylvester was not on notice during plea negotiations of the possibility that the prior Florida conviction would be used against him as a strike conviction in California and result in "an entirely different maximum outcome or a significantly higher outcome." Counsel contended Sylvester would be severely prejudiced if the court "were to allow an amendment at this time literally after the closings have been made when Mr. Sylvester prior to trial was unaware that a conviction out of Florida would be used as a strike."

The prosecutor responded that he had apprised defense counsel of his attempts to obtain necessary information about Sylvester's prior conviction from Florida during plea negotiations and that on July 3, 2014, the prosecution and defense had reached a "final agreement" that if Sylvester signed a change of plea form pleading guilty to two counts– one count of assault with a deadly weapon against Adame and one count of inflicting injury to a member of a dating relationship against Johnson–with an out-on-bail enhancement and great bodily injury enhancement, the prosecution would stipulate to a prison term of eight years and would not pursue obtaining documentation on Sylvester's prior Florida conviction.

As noted, Sylvester signed the change of plea form and the parties appeared before Judge Lewis to enter the change of plea on the record on July 7, but Sylvester at that

11

point decided not to enter into the plea agreement. The prosecutor stated to Judge Lasater: "We were sent back to Department 11 in front of Judge Lewis and at that point in time I stated on the open record that we had discussed this prior conviction from Florida and that if [Sylvester] was not going to accept the deal that had been agreed upon the prior week, that I would be pursuing obtaining that documentation from Florida and that if and when it arrived, I would review it, and I would add it onto the charging document. And Judge Lewis on the record talked to the defendant about that, and I don't know if the court reporter in Department 11 recorded it or not but the defendant said out loud, oh, something to the effect of . . . that strike prior from Florida, and he shrugged his shoulders. [¶] Judge Lewis indicated that what the possible effects would be that a strike prior and a [serious] felony prior could be added on."

The prosecutor summarized: "Defense counsel was aware that this was out there. I was not aware of what the extent of the details were, and I took a measured approach at how to address it. I wanted to make sure that it was clear to everybody that this was something that could be added when the defendant decided not to proceed with the change of plea on Monday, July 7th. Judge Lewis reiterated on the record, and it was obvious to me that [defense counsel] and his client had discussed it because they had a conversation out loud about the prior conviction. [¶] And so having seen that, having Judge Lewis inform him, having included it in my trial brief, having discussed this throughout this week, I don't believe anybody can claim they weren't on notice."

Sylvester's counsel responded, "I'm not sure–I was obviously in court on the 7th. I don't remember Judge Lewis necessarily saying that there was going to be an

12

amendment. I think she said something along the lines of: Do you understand what he's saying and that's about it. But that's neither here nor there. [¶] At the end of the day I don't think the issue is so much that there was notice regarding the addition to this case so much as–well, let me back up. The issue at the end of the day is there was no real discussion about adding any kind of strike until just before trial. I wasn't provided documentation that even allowed me to investigate the issue until the 8th. [¶] While there had been discussion about an arrest and I was able to discuss the issue with my client, my client who, once again, was never told that anything out of . . . Florida was a strike since they don't have the same laws. They didn't have the same notice requirement that people are told. It's a strike. You'll have enhanced punishment, 80 percent credits. None of that stuff was discussed at any kind of change of plea."

The court allowed the prosecution to file the third amended information, stating, "I am going to allow the amendment. In looking at the totality of the circumstances, considering the arguments of counsel, I think that it is appropriate to allow it, and I am going to allow it."

Relevant Legal Authority

Section 969a provides: "Whenever it shall be discovered that a pending indictment or information does not charge all prior felonies of which the defendant has been convicted either in this State or elsewhere, said indictment or information may be forthwith amended to charge such prior conviction or convictions, and if such amendment is made it shall be made upon order of the court, and no action of the grand jury (in the case of an indictment) shall be necessary. Defendant shall promptly be

13

rearraigned on such information or indictment as amended and be required to plead thereto." Section 969a permits the prosecution to amend an information to include prior felony conviction enhancement allegations even after the jury has reached a verdict. (*People v. Valladoli* (1996) 13 Cal.4th 590, 594, 609 (*Valladoli*).)

"Section 969a expressly gives discretion to our trial judges to permit or deny the amendment [citation], and we rely in such matters on the prudent exercise of that discretion to ensure the due process rights of criminal defendants are adequately protected. In exercising such discretion, courts should scrutinize (i) the reason for the late amendment, (ii) whether the defendant is surprised by the belated attempt to amend, (iii) whether the prosecution's initial failure to allege the prior convictions affected the defendant's decisions during plea bargaining, if any, (iv) whether other prior felony convictions had been charged originally, and (v) whether the jury has already been discharged [citation]. This list . . . is intended to be illustrative rather than exhaustive, and . . . the matter is best left to the discretion of our trial judges." (*Valladoli supra,* 13 Cal.4th at pp. 607-608, fn. omitted.)

Although we generally review a trial court's decision to allow an information to be amended to allege a prior conviction for abuse of discretion, we are mindful that where " 'fundamental rights are affected by the exercise of discretion by the trial court, . . . such discretion can only be truly exercised if there is no misconception by the trial court as to the legal basis for its action.' [Citations.] To exercise the power of judicial discretion, all material facts and evidence must be both known and considered, together with legal principles essential to an informed, intelligent and just decision." (*People v. Lara* (2001)

14

86 Cal.App.4th 139, 165.)  In the present case, the trial court's exercise of discretion to allow the prosecution to amend the information was based on a critical misconception of material facts regarding the second and third *Valladoli* factors that our Supreme Court has directed trial courts to "scrutinize" before permitting such amendment–i.e., whether the defendant was surprised by the belated attempt to amend and whether the prosecution's initial failure to allege the prior convictions affected the defendant's decisions during plea bargaining.  (*Valladoli supra,* 13 Cal.4th at p. 607.)

The People argue that Sylvester could not have been surprised by the amendment of the information to allege the Florida conviction because (1) the prosecutor mentioned at the preliminary hearing that he had "obtained some information regarding [Sylvester's] prior criminal history from Florida that [he] was previously unaware of and was not considered earlier[,]" and he was in the process of obtaining reports from Florida; (2) the prosecutor sent letters dated June 30, 2014, and July 2, 2014, to defense counsel in which he mentioned his attempts to obtain reports from Florida regarding Sylvester's "robbery case"; (3) the prosecutor again raised the issue of the Florida prior conviction at the change of plea hearing, in his trial brief, and before Judge Lasater on the first day of trial.

Although Sylvester was aware his prior Florida conviction was being discussed and the prosecutor was considering amending the information to allege it if and when he obtained certain documents from Florida, the record does not show he was informed that his prior conviction could be used to enhance his sentence in the present case until the day of trial when the prosecutor filed his trial brief stating the conviction likely qualifies as a prior serious felony and a prior strike under California law.  Because Sylvester was

15

not on notice of the maximum sentence he potentially faced by going forward with the trial when he decided to reject the prosecution's plea offer, the prosecution's belated amendment of the information during trial constituted "surprise" for purposes of considering whether to allow the amendment.

Further, the record shows Judge Lasater was misinformed about Sylvester's notice of the prosecution's intended use of his prior Florida conviction when he rejected the plea deal before trial. Referring to the change of plea hearing, the prosecutor told Judge Lasater that Judge Lewis had "on the record talked to the defendant about that, and I don't know if the court reporter in Department 11 recorded it or not but the defendant said out loud, oh, something to the effect of . . . *that strike prior* from Florida, and he shrugged his shoulders. [¶] Judge Lewis indicated that what the possible effects would be *that a strike prior and a* [*serious*] *felony prior* could be added on." (Italics added.)

Sylvester did not refer to his prior conviction as "that strike prior from Florida," and Judge Lewis did not mention how a strike prior or serious felony prior could possibly affect his sentence. The exchange in question between Judge Lewis and Sylvester occurred immediately after the prosecutor stated that he had withdrawn the plea offer and there was "the possibility of an additional . . . prior that we are still looking into. We will continue to look into that. Whether or not that is something we can allege is yet to be determined." Judge Lewis then asked Sylvester, "Do you understand that?" Sylvester replied, "No, not really–a prior?" There was no reference by Sylvester or anyone else during that hearing of a "strike prior" or "serious felony prior." The People acknowledge in their respondent's brief that "Judge Lewis did not warn [Sylvester] of the possible

16

effects of a prior strike and prior serious felony, at least not on the record." It appears from the record that at the time of the change of plea hearing the prosecutor had not obtained sufficient information about Sylvester's Florida conviction to determine whether the conviction would qualify as a strike prior or serious felony prior.

Although Judge Lasater's decision to allow the prosecution to amend the information was not unreasonable considering her misconception of what had occurred in the previous hearing before Judge Lewis, it was not a proper exercise of judicial discretion because she did not know all of the material facts. Whether Sylvester had been informed at the change of plea hearing that the Florida prior conviction could be alleged as a strike prior or serious felony prior that would substantially increase his prison sentence was a material fact that Judge Lasater presumably considered in exercising her judicial discretion to allow the amendment. However, she exercised her discretion under a misconception regarding that material fact–i.e., the misconception that Sylvester was on notice that he faced the possibility of sentencing enhancements for a strike prior and serious felony prior by rejecting the prosecution's plea offer. Given the court's misconception regarding that material fact, we cannot say the court properly exercised its discretion in deciding whether to allow the prosecution to amend the information. (*People v. Medina* (1980) 107 Cal.App.3d 364, 370 [trial court action taken "without full knowledge of all the material facts" was an abuse of discretion].) "Failure to exercise a discretion conferred and compelled by law constitutes a denial of a fair hearing and a deprivation of fundamental procedural rights, and thus requires reversal." (*People v. Penoli* (1996) 46 Cal.App.4th 298, 306.) Accordingly, the order allowing the amendment

must be reversed.  (See *People v. Lara, supra,* 86 Cal.App.4th at p. 166.)[4]  We remand the matter to permit the trial court to exercise its discretion in considering whether to allow the People to file the amended information based on a correct view of the facts and circumstances surrounding the July 7, 2014, change of plea hearing before Judge Lewis. (See *People v. Lettice* (2013) 221 Cal.App.4th 139, 153.)  Considering our decision that because of Judge Lasater's lack of correct information it was reversible error to allow the prosecution to amend the information to allege Sylvester's prior Florida conviction, we need not address Sylvester's contention that he is entitled to be resentenced because the trial court did not act with informed discretion regarding its decision to stay or not stay the sentence enhancement for his prior serious felony conviction allegation.

II

*Consecutive Sentencing on the Criminal Threat Conviction*

Sylvester contends that under section 654, the court should have stayed sentence on his conviction of making a criminal threat against Adame (count 6).  Section 654, subdivision (a), provides that "[a]n act or omission that is punishable in different ways by

---

4      The People contend that the standard of reversal under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) applies, and reversal under that standard is not required because it is not reasonably probable the trial court (Judge Lasater) would have denied permission to amend the information had the prosecutor not misinformed the court. Assuming, without deciding, the *Watson* standard applies to the court's failure to exercise informed discretion in permitting the amendment, we conclude reversal is nevertheless required because there is a reasonable probability the court would have denied leave to amend the information had it known that when Sylvester decided not to accept the prosecution's plea offer, he was not on notice that his prior conviction could result in strike prior and serious felony prior sentencing enhancements.

18

different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  Sylvester argues section 654 prohibits his being punished for both count 3 (inflicting injury to a member of a dating relationship (Adame)) and count 6 (making a criminal threat against Adame) because his threats to kill Adame while he was hitting her were incident to the same objective–i.e., to assault and frighten her.

" '[S]ection 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction.  [Citation.] . . . [Citation.]  If all the offenses were *incident to one objective,* the defendant may be punished for any *one* of such offenses but not for more than one.'  [Citation.]  'If [a] defendant harbored "multiple criminal objectives," which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, "even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." '  [Citation.]  The application of section 654, thus, 'turns on the *defendant's* objective in violating' multiple statutory provisions.  [Citation.]  Where the commission of one offense is merely ' "a means toward the objective of the commission of the other," ' section 654 prohibits separate punishments for the two offenses."  (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1288.)

The trial court must stay execution of sentence on any conviction for which section 654 prohibits multiple punishment.  (*People v. Kurtenbach, supra,* 204

19

Cal.App.4th at p. 1289.) "A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence." (*People v. Blake* (1998) 68 Cal.App.4th 509, 512; *People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

Sylvester argues that section 654 prohibits his being punished for both count 3 (inflicting injury to a member of a dating relationship (Adame)) and count 6 (making a criminal threat against Adame) because his threats to kill Adame while hitting her were incident to the same objective–i.e., to assault and frighten her. We conclude substantial evidence supports the court's implied finding that Sylvester harbored two independent criminal objectives–namely, as Sylvester's own argument suggests, the objective of physically harming her and the separate objective of frightening her by threatening to kill her, her unborn baby, and her brother. The court could reasonably find that Sylvester's hitting Adame was not simply a means of bolstering his threats to kill her and her baby, which were intended to frighten and intimidate her, but rather reflected the separate intent of physically injuring her. Because section 654 prohibits multiple punishment for offenses only when the defendant had the same intent and objective for each offense, the court did not err in sentencing Sylvester on both count 3 and count 6.

III

*Order Prohibiting Sylvester from Having Contact with His Child*

At the sentencing hearing over Sylvester's objection, the court issued a criminal protective order under section 273.5, subdivision (j), prohibiting Sylvester from having contact with Adame, Johnson, and his and Adame's daughter Alina, born in January

2014. Sylvester contends the order barring him from contacting Alina must be stricken because there is no statutory authority for that order and it violates his federal constitutional right to due process.

Section 273.5, subdivision (j), provides, in relevant part: "Upon conviction under subdivision (a), the sentencing court shall also consider issuing an order restraining the defendant from any contact with the victim, which may be valid for up to 10 years, as determined by the court. It is the intent of the Legislature that the length of any restraining order be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family."

Section 273.5, subdivision (b), provides that section 273.5, subdivision (a), applies "if the victim is or was one or more of the following: [¶] (1) The offender's spouse or former spouse. [¶] (2) The offender's cohabitant or former cohabitant. [¶] (3) The offender's fiancé or fiancée, or someone with whom the offender has, or previously had, an engagement or dating relationship . . . . [¶] (4) The mother or father of the offender's child."

Sylvester argues that under the plain language of section 273.5, the court did not have authority to issue a protective order as to Alina because she was not a victim under subdivision (j) of Sylvester's violation of subdivision (a)–i.e., she was not the victim of his willful infliction of corporal injury. Further, Sylvester argues, children do not fall within one of the categories of victims listed in subdivision (b), which limits victims of violations of subdivision (a) to spouses, cohabitants or former cohabitants, present or

21

former fiancés and fiancées, and persons with whom the defendant has or had a dating relationship.

The People urge us to construe section 273.5, subdivision (j), in accordance with the appellate court's construction of substantially similar statutory language in *People v. Clayburg* (2012) 211 Cal.App.4th 86 (*Clayburg*). The defendant in *Clayburg* was convicted of stalking her former husband in violation of section 646.9, subdivision (a). (*Clayburg, supra,* 211 Cal.App.4th at p. 88.) The defendant's stalking behavior caused her minor daughter to suffer emotional distress, and both the victim father and daughter had obtained restraining orders against the defendant. (*Id.* at pp. 90, 91.) Like subdivision (j) of section 273.5, subdivision (k)(1) of section 646.9 provides that "[t]he sentencing court also shall consider issuing an order restraining the defendant from any contact with the victim, that may be valid for up to 10 years, as determined by the court. It is the intent of the Legislature that the length of any restraining order be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family."

The majority in *Clayburg* concluded the reference in the second sentence of section 646.9, subdivision (k), to "the safety of the victim and his or her immediate family" as a factor to be considered in determining the length of a restraining order broadens the definition of the word "victim" in preceding sentence to include members of the stalking victim's immediate family. (*Clayburg, supra,* 211 Cal.App.4th at pp. 88-89, 90-92.) Accordingly, the *Clayburg* majority held "that a member of the immediate

family of a stalking victim [citation] who suffers emotional harm, here a child, is a 'victim' for purposes of a postconviction restraining order." (*Id.* at p. 88.)

In a dissenting opinion in *Clayburg*, Justice Perren interpreted section 646.9, subdivision (k)(1), as authorizing a protective order only for the named victim of the stalking offense. Justice Perren reasoned: "The first sentence of subdivision (k) instructs that the court may issue an order 'restraining the defendant from any contact with *the victim.*' (Italics added.) The second sentence, however, tells us that in determining the length of the restraining order, the court may consider 'the safety of the victim and his or her immediate family.' If 'victim' was meant to include a child of the family, this qualification would be unnecessary. Moreover the distinction is underscored by section 646.9, subdivision (*l*) where 'immediate family'[5] is defined. Had the Legislature intended to include members of the immediate family amongst those entitled to the benefit of a restraining order, it would have said so. It did not." (*Clayburg, supra,* 211 Cal.App.4th at p. 94 (dis. opn. of Perren, J.).)

In *People v. Delarosarauda* (2014) 227 Cal.App.4th 205 (*Delarosarauda*), a defendant was convicted of corporal injury to a spouse in violation of section 273.5, subdivision (a), and other offenses, and the trial court issued a criminal protective order as to the victim and her two children, the defendant's son and stepdaughter.

---

5    "For purposes of this section, 'immediate family' means any spouse, parent, child, any person related by consanguinity or affinity within the second degree, or any other person who regularly resides in the household, or who, within the prior six months, regularly resided in the household." (§ 646.9, subd. (*l*).)

(*Delarosarauda* , at pp. 208-209.)  On appeal, the defendant argued the court did not have authority to issue a protective order as to the children because they were not victims of the charged offenses.  (*Id.* at p. 210.)  Relying on *Clayburg*, the People contended the children were victims for purposes of the protective order because they were immediate family members of the victim of the charged offenses.

The *Delarosarauda* court disagreed with the *Clayburg* majority's interpretation of section 646.9, subdivision (k), stating,  "We read the second sentence to mean what it says: the court should consider, among other factors, the 'safety of the victim and his or her immediate family' in determining the length of the restraining order authorized in the first sentence.  Nothing suggests the second sentence also modifies the scope of the restraining order.  As noted by Justice Perren in the *Clayburg* dissent, if the term 'victim' in the first sentence included a child of the family, the second sentence would have no need to refer to ' "the victim and his or her immediate family." ' "  (*Delarosarauda, supra,* 227 Cal.App.4th at p. 212.)

Turning to section 273.5, subdivision (j), the *Delarosarauda* court concluded: "Under the plain language of section 273.5, the court lacked authority to issue a protective order as to [the children].  First, [the children] are not victims under section 273.5, subdivision (j).  [The mother] confirmed that appellant never used physical force against them [citation]."  Second, for the reasons stated above, the second sentence of section 273.5, subdivision (j)–addressing the length of the restraining order–does not modify the term 'victim' in the first sentence or expand it to include the children.  Our interpretation is bolstered by the fact that the children do not fall within one or more of

24

the categories of victims listed in section 273.5, subdivision (b). That statutory section limits the applicability of section 273.5, subdivision (a) to certain victims (spouses, cohabitants, fiancées, and parents of the offender's child), and correspondingly limits the scope of the restraining order authorized by section 273.5, subdivision (j). Thus, section 273.5, subdivision (j) does not authorize the court to issue a protective order as to [the children]." (*People v. Delarosarauda* (2014) 227 Cal.App.4th at p. 213.)

We agree with the reasoning of *Delarosarauda* and the *Clayburg* dissent, and conclude that the second sentence of section 273.5, subdivision (j), does not modify the term "victim" in the first sentence or broaden its meaning to include Alina, who was not harmed physically or emotionally by Sylvester's infliction of corporal injury on Adame.[6]

The People argue that even if we determine section 273.5, subdivision (j), did not authorize the protective order as to Alina, we should conclude the court had authority to issue it under section 136.2, subdivision (i)(1).[7] The People rely on this court's opinion

---

[6] The *Clayburg* majority's conclusion that the stalking victim's daughter was also a victim of the stalking for purposes of the postconviction protective order largely rested on the fact that the defendant's stalking caused the daughter to suffer emotional harm. As noted, the *Clayburg* majority held that "a member of the immediate family of a stalking victim [citation] *who suffers emotional harm* . . . is a 'victim' for purposes of a postconviction restraining order." (*Clayburg, supra,* 211 Cal.App.4th at p. 88, italics added.) Thus, *Clayburg* is factually distinguishable from the present case in that Adame's unborn child Alina did not suffer any emotional or physical harm from Sylvester's violation of section 273.5, subdivision (a)–i.e., infliction of corporal injury on Adame.

[7] Section 136.2, subdivision (i)(1) provides, in relevant part: "In all cases in which a criminal defendant has been convicted of a crime involving domestic violence as defined in Section 13700 . . . , the court, at the time of sentencing, shall consider issuing an order restraining the defendant from any contact with the victim. The order may be valid for up to 10 years, as determined by the court. This protective order may be issued

25

in *People v. Beckemeyer* (2015) 238 Cal.App.4th 461 (*Beckemeyer*), in which the trial court issued a postconviction protective order under section 136.2, subdivision (i)(1), that restrained the defendant convicted of attempted murder and assault with a deadly weapon from contact with a woman he had been dating and her adult son. The defendant hit his female victim "in the head with his fist, knocked her down, sat on top of her, pulled hair out of her head, repeatedly banged her head on the floor, and tried to choke her." (*Beckemeyer,* at pp. 463-464.) When the woman's son appeared and told the defendant he had called 911, the defendant hit the son and knocked him down, punched him, beat him with a cane, and repeatedly hit him with a rock. (*Id.* at p. 464.) When the mother intervened, the defendant knocked her down, banged her head on a drill press and tried to snap her neck by jerking it from side to side. (*Ibid.*) The defendant pleaded guilty to attempted murder of the mother and assault with a deadly weapon of the son. (*Ibid.*) On appeal the defendant argued that the postconviction protective order must be stricken as to the son because he did not qualify as a domestic violence victim.

In rejecting the defendant's argument, the *Beckemeyer* court noted that "[s]ection 136 defines 'victim' for purposes of a section 136.2 protective order, stating: 'As used in this chapter: [¶] . . . [¶] (3) "Victim " means any natural person with respect to whom there is reason to believe that any crime as defined under the laws of this state . . . is

by the court regardless of whether the defendant is sentenced to the state prison or a county jail or subject to mandatory supervision, or whether imposition of sentence is suspended and the defendant is placed on probation. It is the intent of the Legislature in enacting this subdivision that the duration of any restraining order issued by the court be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family."

being or has been perpetrated or attempted to be perpetrated.' " (*Beckemeyer, supra,* 238 Cal.App.4th at p. 465, italics omitted.) Accordingly, the *Beckemeyer* court held section 136, subdivision (i)(1), "encompasses a person, like [the son], who was *actually assaulted* during the domestic violence incident, and who accordingly meets the broad definition of 'victim' set forth in the statutory scheme." (*Id.* at p. 463.)

*Beckemeyer* is distinguishable from the present case because Sylvester did not assault or harm Alina during the domestic violence incident. Although he uttered a threat to kill Alina *to Adame*, he did not perpetrate or attempt to perpetrate any crime *against Alina.* Unlike the son in *Beckemeyer*, Alina does not meet the broad definition of "victim" set forth in the statutory scheme. Accordingly, the court did not have authority to issue the protective order as to Alina under section 136.2, subdivision (i)(1).

The People contend that if the trial court lacked statutory authority to issue the protective order as to Alina, we should uphold the order as a legitimate exercise of the court's inherent authority to issue no-contact orders when necessary to ensure the safety and privacy of those involved in judicial proceedings. The People rely on *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1094, in which the Supreme Court held the trial court has inherent authority to protect the safety and privacy of jurors following their discharge from a trial. Relying on *People v. Ponce* (2009) 173 Cal.App.4th 378, 383-385 (*Ponce*), Sylvester argues the protective order as to Alina was not a proper exercise of the court's inherent authority because the order was not justified.

The People in *Ponce* cited *Townsel* as support for the argument that a protective order improperly issued under section 136.2 was nevertheless valid because trial courts

have inherent authority to issue protective orders to protect trial participants.  The *Ponce* court rejected that argument, stating:  "An existing body of statutory law regulates restraining orders.  ' "[I]nherent powers should never be exercised in such a manner as to nullify existing legislation . . . ." '  [Citation.]  Where the Legislature authorizes a specific variety of available procedures, the courts should use them and should normally refrain from exercising their inherent powers to invent alternatives.  [Citation.]  [¶]  Moreover, even where a court has inherent authority over an area where the Legislature has not acted, this does not authorize its issuing orders against defendants by fiat or without any valid showing to justify the need for the order."  (*Ponce, supra,* 173 Cal.App.4th at p. 384.)

The *Ponce* court noted that in *Townsel*, an order protecting jurors by prohibiting the defendant's appellate counsel from contacting them without first obtaining the trial court's approval "was justified because of the defendant's history of interfering with the judicial process by killing or threatening witnesses."  (*Ponce, supra,* 173 Cal.App.4th at p. 384.)  The *Ponce* court further noted that in *People v. Stone* (2004) 123 Cal.App.4th 153, the Court of Appeal "held that a protective order could not be sustained without a showing of 'a threat, or likely threat *to criminal proceedings or participation in them.*' "  (*Ponce, supra,* 173 Cal.App.4th at p. 384, quoting *Stone,* at p. 160.)  The *Ponce* court observed there was no evidence the defendant "had threatened, or had tried to dissuade, any witness, or had tried to unlawfully interfere with the criminal proceedings.  The prosecutor did not make an offer of proof or any argument to justify the need for a protective order.  He simply said, '[W]e'd also like to have a stay-away order in this case

28

. . . .'  But a prosecutor's wish to have such an order, without more, is not an adequate showing sufficient to justify the trial court's action." (*Ponce, supra,* 173 Cal.App.4th at pp. 384-385.)

Similarly, there is no evidence or argument in the present case that Sylvester posed any threat to criminal proceedings or participation in criminal proceedings that would justify a statutorily unauthorized protective order prohibiting him from contacting Alina. The trial court did not have statutory or inherent authority to issue the protective order as to Alina.  In the event future circumstances justify an order protecting Alina from contact with Sylvester, there are statutes that authorize the family and juvenile courts to provide such protection.  (See, e.g., Fam. Code, §§ 6320 et seq. & 6340 et seq.; Welf. & Inst. Code, § 213.5.)

## DISPOSITION

The order allowing the prosecution to file the third amended information alleging a prior conviction is reversed and the matter is remanded to the trial court to reconsider whether to allow the prosecution to file the third amended information based on the facts and circumstances regarding the July 7, 2014, hearing before Judge Lewis and, if necessary, to resentence Sylvester.  If after reconsideration of the matter the court allows the third amended information, Sylvester's sentence will remain unchanged.  If the court resentences Sylvester without the prior strike conviction and prior serious felony conviction enhancements, the court is directed to prepare an amended abstract of the judgment reflecting the resentencing and forward the amended abstract to the Department of Corrections.  The court is further directed to modify the criminal protective order

29

issued under section 273.5, subdivision (j), by removing Alina S.'s name from the list of protected persons. In all other respects, the judgment is affirmed.


McDONALD, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.